May it please the court, Christy Hughes, Federal Defenders, on behalf of Mr. Zapata. The agents here violated Mr. Zapata's constitutional rights and coerced him to talk about his involvement in the offense by telling him that if he didn't answer their questions, it would be worse for him at sentencing. This is in spite of the clear rule in Harrison that police may not tell a suspect that refusing to answer police questions will result in harsher treatment by a judge. Suppose that they told him, we'd like to bring to your attention sentencing guideline 3E.1.1, which says that a sentencing judge can reduce the initial starting point of computation of sentence by taking into consideration your admission of responsibility and further by cooperation. You don't have to tell us the name of Mr. Bigg, but if you do, it'll go, it'll reduce your sentence. Isn't that telling him that if he doesn't talk, it'll go worse for him? Well, no, Your Honor. There is a distinction, and Harrison makes this clear. It says it's two sides of the same coin, but there is a very clear distinction between telling someone your cooperation will be rewarded and your failure to cooperate will be punished. And so here they're very clear about what they say. They say you'll have to be sentenced based on no statements, and that will be worse for you. And then a few pages of the transcript after that, they say you put yourself in a worse position if you say nothing. So they're not saying, hey, if you give us all the details, the judge might take that into consideration. They say if you sit here and you continue to give us no information and you don't answer our questions, it's going to result in a longer sentence. And they've previously told him it's a foregone conclusion that you're going to jail. Kagan said if you keep quiet, you won't be helping yourself. Right? Well, again, I don't know. How do we – here's the point that I'm wondering. I suppose if you take isolated statements that Messiah Markeish told him and the other officer told him, you could parse that into your argument. But do we do that, or do we take the totality of the circumstances test? Do we take all the statements and see what the substantial purport of them is? Which is that? First, Your Honor, it is a totality of the circumstances test. It is. But in Harrison, the government tried to argue, look, yes, they told her, you know, do you think it would be better if we told the judge that you cooperated or not, and they said that was a coercive statement. And the government said, well, who cares, because she had a college education. She said she understood her rights. She was in her own home. This wasn't her first time in the criminal justice system. And so when you look at the totality of the circumstances, this wasn't coercive. And this Court said no. There are no circumstances, and the Court italicizes no in its opinion, in which you may tell a defendant that he will be punished more harshly if he refuses to talk. And so you have to really look at that statement. Here we have two statements. Kennedy, did they tell him if you refuse to talk or if you refuse to help yourself? They say. I mean, they say both things, right? Well, they say you're going to have to be sentenced based on no statements because I'm not going to have anything to write. And then they say, so it's worse for you. You're going to go to sentencing, and you're going to have no statements for the judge to consider. And then after that, they say you put yourself in a worse position if you say nothing. So I think those two together, they're making it very clear. If you say nothing, they're implicating his right to silence. They aren't just saying, oh, if you cooperate, that may help you. They're specifically targeting his failure to come clean and give a confession. Additionally, I think, I don't know if Your Honor ---- Let me ask you a question. So you're saying that what I should do is look at the totality of what they are saying, and based on that totality, I'm to make my determination here, or can I look at the And what your client did after making those statements and determine whether there was some problem. I think that's the issue. Again, Harrison says no circumstances. And the question is whether or not this coercive statement overbore his will. And so I think, Your Honor's question, that's exactly what you do. You look at what he's saying. Well, I was asking one alternative or another. So I'm still having a tough time. The second one. And what I did was I took the comments made that were made by the particular people who were making the comments to him, and then I read what he said thereafter and how he changed thereafter, if he changed. And my worry was that the first time where I find him doing any change at all was on page 25, where they're saying you're not helping yourself one bit by denying it or not telling us what's going on. You're not getting out of the situation. I can tell you right now you're not totally incorrect. Bottom line is you're going to prison. You're going to have to take responsibility whether you want to or not. But you can help yourself by being honest. I'm telling you this is the only chance you're going to get. This is the only chance. You need to talk. If you don't talk, talk to her. I'll sit over here, and I won't say a blank word. Okay, so when I read that, and you look at the whole of what happened, even on the video, it seemed to me after saying that he does start talking a little more. Correct. A lot more. Well, I'd say a lot more. I'll even go with here, a lot more. But before that, it doesn't seem to me that he changes anything. So some of this stuff that you're really talking about doesn't seem to have changed his general approach. And so I'm wondering, are you telling me to focus in on this one, these one things, or am I to focus in on the whole thing and then look at the whole thing and see whether it changed anything? Because my worry is that if I look at the whole thing, but you cannot help yourself by being honest, comes out many times in what they said, which I think one can say. What I'm really looking at is did they force him to talk because they were going to give him punishment, not honesty. Right. And so I'm looking at the different parts. Well, let me walk you on it. So if you'd help me. So Your Honor left off the first statement, actually, which is at ER 32, but it's page 21 of the transcript. But that's long before where I am. No, I understand. I just wanted to make sure that Your Honor was considering the statement where they say, you're going to have to be sentenced based on no statements, and that's worse for you. Yes, that's on page 21. Correct. And then I read everything he said after that, and he didn't change at all. So in the beginning, before they make these statements, he says, I bought the van like that. No one paid me to drive it. I don't know anything about it. They make these statements, and everything changes. He admits, I got paid $1,500 to drive it. When did he admit that? The honest truth is that he doesn't admit that until we get to the page 25 of the 40-page transcript. He talks about getting cigars. But page 25 is where that you actually put yourself in a worse position by saying nothing. That's where that coercive statement comes. And then after that, that's when he gives very specific details. The cross streets in L.A. where he's supposed to leave the van, he's being paid $1,500, someone bought the van for him, and he allowed it to be registered in his name. He gives the grocery store in Mexico where he picks up the van. I mean, he gives all of these details. And towards the end, he agrees with the agent when she says, you didn't know the type of drugs that were in there, but you knew it was narcotics, right? And he says, yeah. And it's a little bit ambiguous in the transcript, but the video, it's clear. He nods at her. He says, yeah. And then he says, but I didn't know what was in there. Let me ask you a question. In the lower court, it seemed to me that you were complaining that he didn't really know English. And yet that hasn't been brought up here. When I listened to the transcript or watched the video or when I read the transcript of what happened on the video, it doesn't seem to me he knows English at all. In fact, she tricks him into saying things he wouldn't normally have said. She definitely says things that then he agrees with. I don't think that his English is great, and that's actually what the declaration that he filed, was that he didn't understand everything. But she didn't appeal that. That wasn't. I mean, that's one of the circumstances this court can consider, I guess. But no. I mean, the district court actually found that the transcript and the video didn't bear that out. Let me ask you a question. It's my understanding Mr. Zapata is going to be released on January 18th. Correct. It's my understanding he got a deal here from the judge that he didn't only get 24 months, that the sentencing range was 30 to 37 months, and that was with a reduction for cooperation. If he'd have gone to trial, he wouldn't have got that reduction, so it would have been in the 40-month range. 40 to 48 months if he'd have gone to trial. Now, I guess I'm trying to figure out what are we gaining for this guy by doing what you want us to do. If I were to undo this, and I were to say that we should have suppressed this, then the government would come back and they would want 40 to 48 months. And he's already served 24. What are we gaining for him by doing what you want to do? Well, you're suppressing the statement that the government thinks is great evidence against him. Well, but even if we suppress that statement, look at the evidence that's outstanding against him nonetheless. Well, I also think, I mean, Your Honor is upholding his constitutional right to silence. Well, I understand that. I understand what you want me to do. All I'm trying to do is if I'm really helping Mr. Zapata, if I'm really trying to do the right thing by him for what he did, and he's had a 24-month that he's already served, it seems to me that you're winning the battle, but you may be losing the war. Well, not necessarily. I mean, if the government can't proceed without this conviction, his felony conviction goes away.  But that felony conviction will be off his record. Have you looked at what the evidence is without what he said? I'm aware of it. I mean, the government would have to go forward and prove that at trial, and that's a risk that they would have to take, and they would have to decide if he's already served this portion of his sentence, if they want to go forward with that. I don't know what they would choose to do. Well, and I don't know what they do in San Diego, but I know in Pocatello, if you give him out on a motion to suppress, it seems like the government gets mad and goes for broke every time. They don't seem to deal with things in a rational way. He's already served. Let him go. That's the worry that I'm having. I mean, I see where you're going. I see what the situation is. I'm trying to see whether the questions that we have right there on point make a difference, and then I'm saying what does it do in the whole of the situation. I mean, I think in the whole of the situation, you know, he's entitled to not have this involuntary statement used against him. So I think we have to — Okay. And, Your Honors, if I could just make one quick point about whether or not his story actually changed and whether or not it was over — his will was overborne. There's two documents in the record from the government that demonstrate their belief, at least, that his story did change. Document 28 in the district court file is the government's opposition to the motion to dismiss, in which they describe this agent's technique as a technique to get the truth out of a reluctant suspect. And then they say that was, in fact, effective because the defendant eventually admitted that he was being paid $1,500 to allow people to put something illegal in a car registered to him. And Agent Alvarado, who made these coercive statements, when she swore out her probable cause statement in the complaint, which is the first district court document, she says right in there, she describes the statement that he made, and she says he confessed to making arrangements to cross narcotics in his vehicle from Tijuana. He was going to be paid $1,500. A drug trafficking organization provided him the vehicle, and she goes on. So the government's understanding, both the prosecutors and the agents who was there when he made the statement, believe that his story definitely changed from, I don't know anything, and staring at the table and remaining quiet, to giving all these specific details. So I think his will was overborne. Unless Your Honors have any further questions. No. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Daniel Buescher for the United States. I'd like to begin with what Judge Smith was asking, which I think is the right question, but I think it's important for a different reason. When I was preparing this appeal, I was looking at the statement that the motion to suppress was denied and asking myself, well, this is a conditional plea. If I was the trial attorney, the trial agency, which I was not, is this a statement that I would have used that I thought was sufficiently helpful that I would have used at trial? And if this case is reversed and remanded, we will go to trial, I would suspect, without the statement. And I don't know that it's that helpful in any event, because at the point in time where the defendant ---- Do you stipulate that the motion can be granted? No, absolutely not. Absolutely not. That's not the point I'm trying to make. The point I'm trying to make is that the defendant, after he supposedly was coerced into changing his story, nine times after that, said that he didn't know that there were drugs in the van. And that's typically not a statement that I'm going to use as the prosecutor at trial, put a defendant's statement before the jury nine times where he denied knowing that there were drugs in his van. That's something I'm going to want the defendant to take the stand and say so I can then cross-examine him on it. And the point is, is that he still had his free will and sense of self-direction. Thus, under the totality of the circumstances, this ---- the tactics by the agents, what they said, was not coercive, was not unconstitutionally coercive. You're saying they didn't cross the line by saying things would be worse for you, like threatening. What is the line in this instance? It's been interesting. I've had the privilege of watching several interviews by Border Patrol agents of people on DVDs lately, and it's good that they put them on DVDs. But one thing that strikes me is that there's some of the agents who stick by the cards and do everything by the book, and then there's others who kind of just keep pushing and pushing and pushing and cross the line. And I'm just wondering, where is the line of threatening and coercive kind of questions? That's a fair question. And I think the line depends upon the dialogue that the agent is having at the time. There are two dialogues that agents have. The first dialogue is a dialogue about the Fifth Amendment rights and the Miranda rights and whether the defendant is willing to waive them. With respect to that dialogue, which occurred here, the agents did stay by the book. They read the card, and the defendant indicated expressly he understood his rights and he was willing to answer the questions. At that point, the dialogue shifted to a substantive dialogue about the facts of what took place. And the lines are different depending on which dialogue you read. But you agree we have case law that says that if you give the warnings by the book but then later say things that undermine those warnings or contradict those warnings or render them ambiguous, then you've undone the good job you did by giving the rights in the first place. And that's why we look at the totality of the circumstances. Well, the cases I think Your Honor is referring to, primarily San Juan Cruz, is a case where the ambiguity was introduced pre-waiver. So when the defendant waived his Miranda rights, he didn't have a clear understanding of what they were. Here, the waiver is not tainted by any such ambiguity. They were clearly explained to him, he knew what they were, and he waived them. And then the question becomes, well, at some point during this dialogue over here, the substantive dialogue, was something said that maybe it was an issue raised by the defendant. Maybe the defendant had some equivocation as to whether he wanted to continue to speak to the agents. That would have put it back in this dialogue here. And if we're back in this dialogue here and the defendant had said, you know, I'm not so sure that I want to continue to answer your questions, and the agents had said something along the lines of, well, if you don't continue to answer my questions, you're going to make things worse for yourself, then, yes, I think we have a Harrison problem in that situation. But the important part is, in this appeal, that never took place. The defendant never refused to answer any questions, never invoked his right to remain silent, never equivocated as to whether he wanted to continue to talk to the agents. He was simply answering the questions in a manner that the agents didn't believe. And that's exactly what the district court found. And the district court, responding to the comments that counsel made, said that the agents did not threaten the defendant about his failure to cooperate. The defendant waived his rights and did not stop the interview at any point after being so advised. And that's an important point, and that's absolutely right. The agents were simply challenging his statements because they believed, as agents, that his statements were untrue. And that's what was going on. The substance of his statements, the honesty of his statements were being challenged. And the line is drawn in a different place with respect to those types of challenges than it is for the Miranda challenges. Now, in the Miranda challenges, in the Miranda context, if the agents threaten, cajole, or otherwise exercise any type of improper influence on the defendants, threshold decision whether to invoke or not, they're out of bounds. But once that Miranda waiver is clean, has been obtained, the agents have much more latitude under the law of this circuit, all the way up to the point where the defendant's free will and self-direction is overcome to challenge, to pressure, to call into question the veracity of the defendant's statement. And that's all that was being done here. But when this particular Petitioner or defendant was started, he had a totally different approach than he did when he got to the end. Wouldn't you say that? Agreed. And so aren't we called upon to determine what is the reason for the change of the approach? Isn't that our question? Yes. And if the answer to that is the reason for the change in the approach is that the agents invoked, used unconstitutionally coercive tactics to get there, then the statement should be suppressed from that point forward. Well, if in your briefs you suggest that we can say that his, that he was not overborn for two reasons. One, he never did confess. Correct. And number two, he always exonerated his passenger. But if I read pages 33 and 34 of the transcript, and I don't have it by the transcripts pages, but of the stuff that I watched on the video, if I read page 33 and 34, it doesn't seem to me that one could suggest he never confessed. That's where I disagree. There's actually some law in the circuit that if a prosecutor had taken, had addressed the jury in closing argument with this statement and said this defendant has confessed to this crime, there's some law in the circuit that would suggest that that prosecutor has committed serious prosecutorial misconduct by doing so. Because there was no confession, he did not confess to the element that he knew that drugs were in the van. I think, well. Didn't he say he knew there were narcotics, he just didn't know what kind they were? No. Well, but just a minute. He did. I mean, I, I, it says here's the agent, but, but you know that it's some type of narcotics. Maybe they didn't tell you. The defendant. Yeah, they tell, they no tell me nothing. You go, you, you pick it up, go over there. I don't know what is in there. So they could have put coke, heroin, methamphetamine, anything in the car and you wouldn't? I don't know. So you don't know what's in the car that day? No, I don't know what's in the car. But you know it's drugs and you know it's illegal. Maybe, yeah. But I thought, I don't see nothing, don't know nothing. All right, okay. And, well, you're lucky because it's only marijuana. That's the part I was referring to. Isn't that a confession? I don't, I don't read it that way. And, in fact, the closest he comes is when the agent says, but you know it's drugs and you know it's illegal. Maybe, yeah. And that's the precise facts of the case that I just cited in the court. It's an unpublished decision from 2002. I'm involved in our district where the defendant said that he knew that drugs might be in the car. And the court was very, very clear about that, that that's not a confession. And I don't think it is either. Reading this transcript, I count nine times after the defendant started answering the questions and admitted he was being paid, but still nine times in the transcript where he denied knowing there were any drugs in the van. Well, I don't, I can't characterize it that way because she says, but you know it's drugs and you know it's illegal. Maybe, yeah. What does that yeah mean? But then I don't see nothing. So she doesn't know what kind, and then he's lucky that it's only marijuana. And then he goes on, I told you, I don't know nothing. I don't know what is in there. Yeah, but you know you've got a confession with this statement. Well, I think we have some. Otherwise, why are you even arguing this appeal? Well, that's the point I made at the outset is that I'm not, you know, I don't know how much value the statement would be. And if I was a trial attorney, I would give serious consideration as to whether to use it or not. That's pretty confusing as far as what he said and how he said it. It's not a very clean interview. It goes back and forth. There are a lot of things in there that are, I think, exculpatory to the defendant. But that's neither here nor there. We're here, and she has a right to challenge this case and obtain a reversal if the court finds that this, in the totality of the circumstances, was an involuntary statement. Let me ask you another question. You suggest that the second way you know that his will was never overborn was that he always exonerated his passenger. How does that play in knowing that his will was not overborn? Well, because if he had lost a sense of self-direction as simply letting the agents spoon feed him and he was giving the agents anything that he thought that they wanted to hear, then he would have given up the passenger. He would have said, yes, she knows, because they confronted him with a lot of facts about the passenger's role that would have logically suggested to anybody that she, in fact, knew. But he refused to go there. He refused to take that invitation by the agents to inculpate her. So I think this is a man that still has his sense of self-direction. His free will was not overcome. I think I agree with Judge Wardlaw. We're fortunate to have a DVD here, and I think it's good, and I think it's helpful to resolve these appeals. And looking at the totality of the circumstances, not just what he said, but the whole setting of the interview. In fact, it was in the mid-afternoon. It was only 41 minutes. He was not handcuffed. There were no weapons. The agents never stood up, never yelled at him. It was simply a conversation in which, yes, the answer was yes. Frankly, never yelled at him wouldn't sell with me after watching the video. Yeah, they yelled at him. I mean, I felt like they yelled at him, and I felt like they used language I hadn't heard before in any video I'd ever seen. And they were women. That even added more to my disgust about the whole deal. Right. Well, I think that, you know, certainly they wanted to exercise some control over the interview. But, you know, if the Court disagrees with my characterization, the Court makes the call and the Court has reviewed the video. But, you know, I think as the district court found, it's probably the right characterization that the agents were very aggressive with this defendant, but they were within the bounds of the constitution. Okay. In the plea agreement, was his sentence actually reduced for the cooperation he gave? For acceptance of responsibility. Acceptance of responsibility.  But anything in addition for cooperation? Not to my knowledge. I don't think he was given any credit for the statement that he made, but he was given credit for in the Rule 11 colloquy before the district court, admitting that he imported marijuana in the United States and that he knew it was marijuana. So he accepted responsibility in the Rule 11 plea colloquy, and he got credit for that. But he never was asked who Mr. Big was. He didn't go to any cooperation. That's correct. And for that, he was reduced to 30 to 37 months, and the district judge even gave him less, right? That's true. Yes. Thank you. Thank you very much, counsel. United States v. Nevada will be submitted.
judges: Wardlaw, Bea, Smith